**MID-RIDGE INVESTMENT COMPANY,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

No. 59–C–78.

United States District Court
E. D. Wisconsin.

Nov. 21, 1962.

John L. Palmer, of Whyte, Hirschboeck, Minahan, Harding & Harland, Milwaukee, Wis., for plaintiff.

Richard Mulcahy, Dept. of Justice, Tax Div., Washington, D. C., James B. Brennan, U. S. Atty., Milwaukee, Wis., for defendant.

TEHAN, Chief Judge.

The plaintiff, Mid-Ridge Investment Company, a Wisconsin corporation with a taxable year ending December 31, brings this action pursuant to § 1346 Title 28 U.S.C.A. to recover corporate income taxes alleged to have been erroneously assessed and collected by the defendant, the United States, for the years 1953 through 1956. The defendant, the United States, has counterclaimed against plaintiff as trustee of the Hunholz, Miami, Farwell, Ridge and Edward Apartment trusts for assessed deficiencies in income tax and interest for the years 1953 through 1956.

After a substantial but not entire stipulation of facts had been filed, the case was tried to the court which has now considered the pleadings, the facts stipulated, evidence presented orally at the trial and the arguments of counsel presented both orally and in their briefs and is prepared to render its decision.

STATEMENT OF FACTS.

The plaintiff herein was organized solely for the purpose of acting as the trustee of five separate trusts established under and governed by the laws of the State of Wisconsin. These trusts are designated and referred to as the Hunholz Trust, Miami Trust, Ridge Trust, Farwell and Edwards. The principal as-

sets of the Hunholz Trusts are four apartment buildings having a total of 174 rental units and the other four trusts having as their principal assets one apartment building each, the Edwards having 14 rental units, the Farwell 12 units, the Miami 32 units, and the Ridge 27 units. All of the buildings are located in the City of Milwaukee.

Each of the apartment buildings was constructed prior to 1932 and were financed by the issuance and sale of first mortgage bonds to various Wisconsin residents during the period from 1920 to 1930. The trustee for the bondholders of each issue was the Dick & Reuteman Co. of Milwaukee, Wisconsin. As a result of the depressed economy following the stock market crash of 1929, the owners of the buildings ran into financial difficulties and defaulted first in the payment of real estate taxes, then a default in interest on the bonds, and then default on the bonds themselves. Since all of the owners had paid off quite a considerable amount of the bonds before default and since they felt the depression was temporary they attempted to forestall action by the bondholders. Finally, however, it became necessary to take action in behalf of the bondholders and Dick & Reuteman, as Trustee in each instance, initiated foreclosure actions and obtained judgments of foreclosure against the properties in the Circuit Court for Milwaukee County.

In the case of the Ridge, Edward and Farwell apartments, Dick & Reuteman as Trustee, bid in the respective properties on the foreclosure sales. In the case of the Miami apartments, a bondholders' committee was formed which purchased the property on the foreclosure sale. In the case of the Hunholz properties, there was no foreclosure sale and after prolonged litigation the parties settled the foreclosure action after judgment.

While still acting under the jurisdiction of the Circuit Court, Dick & Reuteman submitted to the Circuit Court in each instance a plan of reorganization which was approved by the bondholders and by the Circuit Court on the following

dates: Miami, October 2, 1936; Ridge, October 25, 1936; Hunholz, April 28, 1937; Farwell, December 13, 1937; and Edwards, September 16, 1940.

There were certain differences in the course of events leading up to the reorganizations and the creation of the respective trusts. For purposes of illustration, we will set forth the history of the events resulting in the formation of the Miami Trust which was the earliest plan to be adopted. Significant variations in the formation of the other trusts can then be considered.

On June 5, 1930, Henry Schloegel of Dick & Reuteman Co. was appointed receiver of the mortgaged property. On September 16, 1931, the Circuit Court for the County of Milwaukee entered a judgment of foreclosure and sale.

On December 27, 1933, a bondholders' protective agreement was executed inviting the bondholders of the Miami apartments to deposit their bonds with a committee depository. This protective agreement recited that the original bond issues of the Miami Realty Corporation of April 19, 1929 was in the principal sum of $90,000 and that at the time of the sale, bonds in an aggregate principal sum of $63,000 would become due and payable. By the terms of the agreement, the committee was given power to purchase said property and apply all or any of the deposited bonds and/or coupons in payment of the purchase price and was also given the power to make, enter into, or become a party to any plan or agreement or reorganization of the property covered by the said trust mortgage or judgment of foreclosure either before or after the Sheriff's sale. On June 4, 1935, the mortgaged property was sold at public sale to the bondholders' committee for $50,000, and the following day a duly executed Sheriff's deed to the property was delivered to the bondholders' committee by the Milwaukee County Sheriff. Thereafter, on August 7, 1935, the receiver of the Miami Apartments, Henry Schloegel, was discharged and the funds remaining in his hands distributed. After payments of costs of foreclosure action, and

interest advanced by the trustee, Dick & Reuteman Co., $194.11 was paid to the bondholders' committee and purchaser at the sale. The Circuit Court entered its order confirming title in the committee and cancelled all bonds and coupons of the Miami Apartments and declared and adjudged that the committee held the property under an express and active trust until the property was sold or disposed of or a plan of reorganization effected.

On August 5, 1935, Dick & Reuteman, as trustee for the bondholders mailed to the bondholders a proposed plan of reorganization by which the record title would be vested in the Finance & Investment Company, a corporation controlled by the Dick & Reuteman Co. The plan provided for the issuance of new ten year bonds for the full amount of the old issue of $63,000 to bear interest at 5%. It provided for the payment of a portion of the delinquent interest and for certificates of delinquent interest to be attached to each $100.00 bond. The possession, management and control of the property was to be vested in the agents of the Dick & Reuteman Co. with a management fee of 6% of the gross income and a $100.00 per year trustee fee. Net income up to 9% of the outstanding first mortgage principal, derived from the operation of the Miami Apartments was to be used, (a) for the purpose of paying current interest; (b) for the purpose of paying delinquent interest certificates or the first mortgage principal. The net income in excess of 9% (without computing depreciation) was to be paid or càrried as a credit—one-half to the registered holders of the first mortgage bonds in proportion to their holdings, and one-half to the Finance & Investment Company. In the event of a sale of the Miami property and payment of the bonds, the net profit from the sale was to be credited —one-half to the registered holders of first mortgage bonds in proportion to their holdings, and one-half to the Finance & Investment Company. The plan provided that no sale could be consummated for less than a fair value fixed by an accredited disinterested appraiser. There was provision for retiring bonds out of net earnings at par and accrued interest on sixty days' notice. The plan further provided that the Finance & Investment Company could not mortgage the property or otherwise create a lien on the real estate unless the consent of bondholders representing a majority of the outstanding bonds was obtained, except mortgages or conditional sales contracts for the purchase of equipment or other beneficial use to the premises. The Finance & Investment Company was to be liable to the bondholders only to the extent of the value of the property.

On October 2, 1936, the Circuit Court of Milwaukee County approved and ratified the plan of reorganization and authorized the property transferred as provided. The Court order recites that 89% of the $63,000 in outstanding bonds had consented to the plan. Title was accordingly transferred to the Finance & Investment Co. on October 2, 1936 by the bondholders' committee, and on the same date, Finance & Investment Company executed a declaration acknowledging that it held legal title in trust for the former bondholders and entered into an agreement with Dick & Reuteman Co. setting forth the conditions under which it held title in accordance with the plan of reorganization and providing for the issuance of new first mortgage bonds to run for a period of ten years. On October 27, 1936, Dick & Reuteman Co. notified the holders of certificates of deposit of the Miami Apartments that, pursuant to the reorganization plan, new bonds issued by Finance & Investment Company, certificates of delinquent interest, checks for 3% delinquent interest and certificates of contingent interest were available in exchange for their certificates of deposit. Neither the plan of reorganization nor the trust agreement between Finance & Investment Company contained a description of these "certificates of contingent interest." The certificate on its face recited the provisions of the reorganization plan and agreement between Dick & Reuteman and Finance &

Investment relating to the distribution of annual income as set forth heretofore and further stated:

"This Certificate is executed by the Finance and Investment Company and attached to this bond for the purpose of evidencing that the holder of this bond has a proportionate interest in any surplus income and/or in any profit which may be derived from a sale of the mortgaged premises. Any sums paid hereunder are to be regarded as additional interest to that fixed in the Trust Mortgage and makes the reorganization plan a very desirable one for bondholders."

In bold type the following writing appears on the bottom of the certificate:

"THIS CERTIFICATE IS TO REMAIN ATTACHED TO THIS BOND UNTIL CALLED FOR PAYMENT OR CANCELLATION BY THE TRUSTEE AND ANY PAYMENTS MADE BY MEANS HEREOF SHALL BE ONLY TO THE DULY REGISTERED HOLDER OF THE BOND CORRESPONDING IN NUMBER WITH THIS CERTIFICATE."

Each mortgage bondholder received a certificate for one unit of contingent interest for each $100.00 in principal amount of mortgage bonds owned by him.

Because the Finance & Investment Company held other property besides that comprising these trusts, Dick & Reuteman Co. decided it would be wise to set up an entirely new corporation whose sole purpose would be to hold the legal assets to these properties. Accordingly Mid-Ridge Investment Company, plaintiff herein, was formed and on January 27, 1938, Finance & Investment Company conveyed the Miami Apartments to Mid-Ridge. Mid-Ridge, as was its predecessor, Finance & Investment Company, was owned by Mr. Kadish and Mr. Reuteman who also owned Dick & Reuteman Co., trustee of the bond issues and the managing agent of the property.

The chronological order of events pertaining to the Farwell, Edwards and Ridge Apartments culminating in a similar trust agreement followed approximately the same course as that of the Miami Apartments, with the difference that in each case, Dick & Reuteman, as trustee for the bondholders, bought the property at the foreclosure sale and received title thereto; and in the case of the Edwards Trust, which was the last trust to be set up, the trust agreement conveyed title directly to Mid-Ridge Investment Company.

The evidence shows that Dick & Reuteman Co., as trustee for the bondholders of the apartment buildings, considered, as one of the alternative plans of reorganization the formation of a corporation. Correspondence between Dick & Reuteman and the bondholders in 1932, indicates that a plan to organize a corporation for the purpose of operating the Ridge Apartments was actually submitted to the bondholders. However, this plan was rejected in favor of the trust set-up heretofore described.

In the matter of the Hunholz Trust there were further differences in the course of events leading up to the formation of the trust, and in the instruments which comprise the trust agreement. The Hunholz properties originally consisted of seven apartment buildings, all of which were owned by the John Hunholz Company. Foreclosure proceedings were instituted in 1934, but litigation continued for three years without being concluded and finally a voluntary agreement was worked out by which Hunholz voluntarily gave up title to the four buildings comprising the Hunholz Trust in the instant case, but retained title to the remaining three buildings. Dick & Reuteman Co., however, continued the active management of all seven buildings. Pursuant to this agreement the four buildings were deeded to the Finance & Investment Company and a trust agreement entered into containing the same provisions for a 50% equity to Finance & Investment Company as in the other four trusts. However, the trust agreement between Finance & Investment Company and Dick & Reuteman Co. executed

April 28, 1937, specifically provides for the Form of Certificate of Beneficial Equity (The certificate used the term "Beneficial Equity" rather than "Contingent Interest" as in the other trusts). The agreement provides that the net annual income in excess of 9% of the then outstanding first mortgage bonds on each such respective building "shall be paid or credited, so long as there remains outstanding and unpaid any portion of the first mortgage bonds on such respective property, one-half of such excess income to the registered holders of such respective bond or bonds on each of the said seven so-called Hunholz buildings, and upon the call, payment, redemption or retirement of such bond in full, then to the registered holder and owner of the respective certificate of beneficial interest theretofore attached and/or belonging to such bond, and one-half of such excess income to the company in its own right, absolutely and not in any trust capacity whatsoever, for its services in the administration of the corporate and financial affairs of said Almeda, Candon Court, Holland and Grand Ann Apartment enterprises."

The testimony of Mr. Kadish is that the bondholders of the three apartment buildings retained by Hunholz also received certificates of beneficial interest in the present Hunholz Trust.

The reorganization plan submitted to the bondholders of all seven John Hunholz properties on February 10, 1937, by Dick & Reuteman Co. contains the following paragraph:

"We recommend the plan of passing the record title to the Finance and Investment Company, in accordance with the terms herein set forth, in preference to the organization of separate corporations to take over each of the equities of the four buildings, for the reason that the dilution of these equities, when divided amongst a total of $797,400.00 in bonds, would create such a small present value for each bondholder, that the expense and inconvenience of organization and administration would, in our opinion, be prohibitive and impractical."

There are certain differences in language in the Certificates of Beneficial Interest in the Hunholz Trust and in the Certificates of Contingent Interest in the other trusts—but the record here discloses that they were treated in the same way in the administration of the trusts by plaintiff herein. At the time of the adoption of the reorganization plans and the creation of the trusts, the certificates represented no realizable value at all. The principal debt, the delinquent interest and taxes were greater than any conceivable value of the property.

Each year thereafter a complete statement of account was given each bondholder by plaintiff. Rick & Reuteman Co., as authorized by the trust agreements, continued to manage the various properties and received a 6% fee for its services. It also received a nominal $100.00 trustee fee in its capacity as trustee for the bondholders. With the advent of an improving economic climate, Mid-Ridge was able to gradually redeem the bonds and pay the delinquent interest. When a bond was redeemed the certificate was detached from the bond and registered in the name of the bondholder and said certificate became marketable, and the evidence shows that there were sales of the certificates after the bonds had been redeemed. The bonds were extended at the end of the first ten-year period for another ten-year period. The last delinquent interest was paid in 1948 and by June 6, 1961 the amount of bonds outstanding in each trust was reduced substantially. In the case of the Edwards Trust all the bonds had been paid by that date; the former bondholders retaining their certificates of contingent interest and receiving a 50% distribution of the profits derived from the operation of the apartment building.

From the beginning of the trust operations to the present date there has been no change in the terms of the trust instrument. In 1952, Dick & Reuteman proposed to the holders of the Certificates of Beneficial Equity of the Hunholz

Trust, a plan to organize four separate corporations to operate the apartment buildings. A letter of September 11, 1952, sent to the certificate holders contained the following language:

"Over the long years there has been an economic shift in the method of evidencing ownership of equities of this kind and business operations have become involved in so many regulatory measures that it now becomes extremely important from a legal, economic and business standpoint to revise the structure of ownership of these properties so that the combined trust set-up for the buildings can be terminated and each property segregated into its individual ownership. For that purpose we have consulted with experienced attorneys and accountants to devise a plan whereby the Certificates of Beneficial Equity in the four buildings can be transferred into regular corporate stock certificates in four separate companies each owning one of the four buildings. This transfer will not change the proportionate holdings or values of the present owners of the Certificates of Beneficial Equity nor, in the opinion of our counsel, will it be a transfer that involves an income tax. It will give to each owner of a Certificate of Beneficial Equity common stock which will be a more usual and more marketable form of security. * * *"

Although 94% of the certificate holders approved the plan with 1.6% dissenting, Dick & Reuteman notified the holders by letter of March 13, 1953 that due to certain legal and tax complexities further study should be made and the matter of reorganization would be held in abeyance. There was no further action taken.

In 1943, a question arose concerning the necessity of affixing documentary stamps to the certificates of beneficial equity upon their transfer. After an exchange of correspondence between the Director of Internal Revenue and Mr. Kadish of Dick & Reuteman Co., the Director issued a ruling on November 16, 1943 holding that the certificates were not subject to documentary stamp taxes. The ruling stated in part:

"In view of the foregoing, it is held the power of the trustees to receive rents and make distribution thereof to the certificate holders does not have the effect of creating an association for profit. The trust agreement shows no plan to carry on a business in buying, selling, leasing or generally dealing in real estate, and appears to be conceived for the purpose of working out a settlement of the mortgage indebtedness and conserving the properties. The trust indenture dated April 28, 1937, therefore, created a strict trust, and it is held the 'Certificate of Beneficiary Equity' is not subject to tax on issue and transfer under section 1802 (a) and (b), of the Internal Revenue Code. * * *"

From 1938 to 1956 the plaintiff herein filed a federal corporate income tax return in which it reported as income the 50% distribution it received under the respective trust agreements as beneficiary and also reported income received from the operation of the apartment buildings which it retained as reserves for repair, maintenance and conservation of the trust property. Plaintiff did not file fiduciary returns. However, in 1957, plaintiff was advised by its counsel as trustee of five separate trusts it was obliged to file fiduciary returns for each year from 1953 through 1956. Accordingly, on December 17, 1957, fiduciary returns for each trust for each year were filed and the net earnings actually distributed to the beneficiaries was deducted, Mid-Ridge's beneficial portion was reflected as a distribution to a beneficiary and the only income remaining and taxable to the trust was that undistributed portion of the trust income not paid to the beneficiaries.

Thereafter, on December 17, 1957, the plaintiff filed its claims for the refund of income taxes it had paid for the years 1953 through 1956. These claims were rejected by the Commissioner of Internal

Revenue and plaintiff, on April 21, 1959, filed this action for recovery of said overpayment because the income properly taxable to the trust had been taxed twice. On June 18, 1959, defendant filed its answer denying the allegations of the complaint and as an affirmative defense, alleging that plaintiff is limited in its refund to the amount of tax paid during the two years immediately preceding filing of its claim. Issue was therefore joined and on June 2, 1960 a pre-trial order provided for the filing of stipulation of facts and the filing of pre-trial briefs by the parties.

Thereafter, during the pendency of the suit, on November 18, 1960, five separate statutory notices of deficiency were mailed to Mid-Ridge Investment Company, as trustee of the five trusts here involved. The plaintiff herein chose not to file a petition with the Tax Court pursuant to the provisions of 26 U.S.C. 7422 (e) and on April 6, 1961, the defendant filed an amended answer, realleging its original answer and in addition entered its counterclaim setting forth the notices of the statutory deficiencies and praying for judgment in the total amount of $109,166.78. Plaintiff filed its reply to the counterclaim on April 11, 1961 admitting receipt of notices of deficiency, but denying all other allegations of the counterclaim.

### DISCUSSION.

It may be noted that originally and before the statutory notices of deficiency were received by the plaintiff on November 18, 1960, the defendant in its pre-trial brief filed November 25, 1960 stated that it was prepared to prove that the plaintiff, Mid-Ridge Investment Company was, in fact, owner in fee of the buildings comprising the individual trusts, subject to the lien of the respective outstanding mortgages, asserting that the only thing owned by the bondholders was the bonds of the Finance & Investment Co. (and its successor, Mid-Ridge Investment Company) secured by a trust mortgage executed to Dick & Reuteman Co. Apparently investigation by Revenue Agents continued during the pendency of this ac-

tion and resulted in the notices of statutory deficiency of November 18, 1960 based upon the theory that each individual trust is an association taxable as a corporation.

Therefore, the only question before the court is whether the five trusts here involved are associations taxable as corporations within the meaning of § 3797 of the Internal Revenue Code of 1939 and § 7701 of the Internal Revenue Code of 1954.

■■ At the outset it is necessary to consider plaintiff's contention that the Government is estopped from contending that the trusts herein are associations taxable as corporations by reason of a ruling of the Internal Revenue Commission of 1943 in which it held that the certificates of beneficial equity of the Hunholz Trust were not subject to documentary stamp taxes because the trust indenture of April 28, 1937 created a strict trust. To the extent that the ruling by the Commissioner necessarily involved consideration of the same legal principles as are in the present case, that ruling may have some relevance here. But the assertion that it estops the defendant from now contending that the trusts are taxable as corporations is without merit. The Commissioner may revoke an earlier ruling based upon an erroneous interpretation of the law. Automobile Club of Michigan v. C. I. R. (1957) 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746. Since the instant case is concerned with an income tax assessment and not the imposition of a documentary stamp tax it was unnecessary for the Internal Revenue Commissioner to revoke the 1943 ruling.

The criteria to be applied in making the determination of whether the five trusts are associations taxable as corporations were set forth by the United States Supreme Court in Morrissey v. Commissioner (1935) 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 and both parties have cited the Morrissey case as controlling.

In the Morrissey case, the court held that a trust which was created and maintained as a medium for the carrying on

of a business enterprise and sharing its gains is classed as an association within the meaning of the Internal Revenue Code if it possesses the attributes which make it analogous to a corporation. Those attributes are: (a) Title to the property embarked in the enterprise is held in trust by trustee as a continuing body during the existence of the trust; (b) Centralized management by trustees either named in the trust instrument with power to select successors or selected by or with the advice of those beneficially interested in the enterprise; (c) An enterprise secure from termination of interruption by the death of the owners; (d) Means of transfer of the beneficial interests without affecting the continuity of the enterprise; (e) Limitation of personal liability of the participants to the property embarked in the undertaking. It is apparent that the attributes named are those which distinguish an association from a partnership. And it is clear from the facts in the instant case that the trusts here involved possess these characteristics.

Title to the property is held in trust by the plaintiff corporation, Mid-Ridge Investment Company, which is a continuing body. The management of the property is centralized in Dick & Reuteman Co. which has managed the properties since the creation of the trusts by virtue of the original trust instruments. The trusts have been in existence for over twenty years and are not terminable by the death of any of the beneficiaries. The beneficial interests represented by the certificates of contingent or beneficial interest are transferable, and, in fact, there have been transfers of some of them, and finally, the trust instrument limits the liability of the participants to the property embarked in the undertaking.

However, under the ruling in the Morrissey case not all trusts possessing the attributes of a corporation are taxable as an association. The essential feature of the undertaking is that it be created and maintained as a medium for the carrying on of a business enterprise and

the sharing of its gains. Plaintiff contends that the trusts in question were clearly created and operated to hold and conserve specific properties for the benefit of the trust beneficiaries with no possibility that the trusts would conduct any active business.

It is our opinion that a fair appraisal of the facts heretofore set forth does not sustain this position. Although the trusts were formed as a result of foreclosure actions against certain apartment buildings by the trustee of a bondholders' committee—the reorganization plans finally adopted contemplated more than a trust arrangement to recover an investment which would otherwise be lost. The trustee for the bondholders, Dick & Reuteman Co. and the trustee corporation, Mid-Ridge Investment Company, have an identity of ownership. Plaintiff, Mid-Ridge, was given a 50% equity and the bondholders the other 50% equity in any future profits derived from the venture. The fact that the certificates of beneficial and contingent interest were of little or no value at the time of the formation of the trusts does not change the character of the venture. As a result of an improved economic climate, astute and competent management of the apartment buildings, the certificates of beneficial or contingent interest have become valuable and the holders thereof are participating in the profits of the venture.

The record shows that Mr. Kadish and Mr. Reuteman, owners of both Dick & Reuteman and Mid-Ridge Investment Company, expended considerable effort in conducting the business affairs of the trusts. The physical maintenance of the buildings, the rental of the apartment units, the hiring of the janitor, contracting for repairs, collection of rents, are all incident to the business of operating an apartment house. In addition, Mr. Kadish testified that he had many "top management" problems in handling the trust, including negotiations with the Building Inspector, and the Industrial Commission, as well as efforts to improve rental income by securing legislative

changes in the rental control laws following World War II.

The facts impel the conclusion that the trusts here involved are a medium for conducting a business for the purposes of sharing the gains therefrom.

The plaintiff contends that in order to be taxed as an association, the trustees must be given the power to sell, reinvest and pledge the property involved and it cites Cleveland Trust Co. v. Commissioner (C.A. 6, 1940) 115 F.2d 481. But that case is in no wise comparable to the instant one. There, a trust device was used for the financing of real estate loans as a substitute for an outright mortgage. The trustee in that case did not operate the twelve-story apartment building which was the subject of the trust but merely held title thereto subject to a long-term lease.

To constitute the carrying on of a business, it is not necessary that the business be a large enterprise. The operation for profit of a single apartment building involves conducting a business and, in fact, corporations whose charters limit their activities to the operation of a single apartment building are not uncommon in the business world.

Since the trusts were organized and maintained to carry on a business for profit and since they possess attributes similar to those of a corporation, the trusts are taxable as associations within the meaning of § 3797 of the Internal Revenue Code of 1939 and § 7701 of the Internal Revenue Code of 1954.

In its reply to the counterclaim the plaintiff has admitted receipt of the statutory notices of deficiency but has denied that any sum is due and owing. The only ground advanced in the pleadings or briefs by the plaintiff for its denial of liability under the assessments is the legal position which has been considered herein and rejected.

Accordingly, the complaint of the plaintiff is dismissed and defendant is entitled to judgment on its counterclaim. In accordance with the stipulation of the parties made in open court, plaintiff shall have the opportunity to recompute the amount payable. Defendant shall be responsible for the preparation of an order for judgment and judgment accordingly.

The foregoing opinion shall stand as and for findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.